# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION, AKRON

```
---------------------------------------------------x
In re:                              :   Case No. 21-50498
                                    :
GENEVA VILLAGE                      :   Chapter 11
RETIREMENT COMMUNITY, LTD           :
                                    :
        Debtor and                  :   Judge Alan Koschik
        Debtor-in-Possession.       :
                                    :
(Employer Tax I.D. No. 01-0825952)  :
---------------------------------------------------x
In re:                              :   Case No. 21-50499
                                    :
GENEVA VILLAGE                      :   Chapter 11
RETIREMENT COMMUNITY, LLC           :
                                    :   Judge Alan Koschik
        Debtor and                  :
        Debtor-in-Possession.       :
                                    :
(Employer Tax I.D. No. 11-3783756)  :
---------------------------------------------------x
```

**MOTION OF THE DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING DEBTOR TO OBTAIN UNSECURED POSTPETITION FINANCING
PURSUANT TO SECTION 364(C)(1) OF THE BANKRUPTCY CODE**

The above-captioned debtors and debtors in possession (the "Debtors"), hereby move the

Court, pursuant to section 364(c)(1) of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the

"Bankruptcy Code"), and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), for the entry of interim and final orders authorizing the Debtors to obtain unsecured postpetition financing (the "DIP Facility").

In support of this Motion, the Debtors respectfully represent as follows:

## I. **Background**

1.     On March 30, 2021 (the "Petition Date"), the Debtors commenced their reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of its property and is operating and managing its business, as debtor in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and venue of the Debtors' chapter 11 cases and this Application is proper pursuant to 28 U.S.C. §§ 1408 and 1409 and Local Bankruptcy Rules.

3.     Geneva Village Retirement Community, LTD., DBA Geneva Village Skilled Nursing & Rehabilitation ("Geneva" or "Debtor"), an Ohio limited liability company, organized March 10, 2004, operates a skilled nursing facility at 1140 South Broadway, Geneva, Ohio 44041 (the "Facility").  Beginning May 10, 2006, Geneva entered into a sublease with its affiliate Geneva Village Retirement Community, LLC, a Delaware limited liability company ("Master Tenant"), organized November 8, 2005.  The Master Tenant exists only to hold the lease to the Facility.  The Master Tenant entered into a lease for Geneva's facility with Geneva LifeCare Center, LLC (the "Landlord"), an unrelated party.  Debtor Geneva is a guarantor for Master Tenant's rent obligations to the Landlord.  Geneva has been operating since May 2006.  It is one of the six nursing facilities operating entities managed by VRC Management, Inc. (VRC), a Delaware S-Corp, and Geneva's

Non-Member Manager.    VRC provides Geneva numerous services including compliance, oversight, legal, reimbursement, strategic planning, and personnel & management oversight.

4.    Through the course of its operations, Geneva has been providing stable operations and excellent care.  It operates a high functioning facility, holding an overall 5-star CMS rating and, as of the week of March 15, 2020, had no Covid-19 infections among the residents.  While once profitable, being in 2016, Geneva began losing money every year.  For example, through November 2017, Geneva posted losses over 400,000 dollars that year.  In an effort to correct this trend, VRC and Geneva attempted to pursue a short term, high acuity patient care strategy; a strategy which had been proven successful at other VRC managed facilities.  However, because the facility is located in an over-bedded[1] county, hospital referral patterns, and other issues, Geneva could not successfully implement its strategy and continued to record losses.

5.    In addition to difficult business environment, Geneva, the Master Tenant, and VRC, have a contentious relationship with the Landlord.  As a condition of the master lease, Geneva was required to pay $4,000 per month to landlord's related consulting company, which never provided services, even when requested.  These payments stopped July 2020.  In 2013, the Landlord threatened litigation when rent decreased, as a function of rent payment methodology based on the Medicaid fair rental value.  The Landlord's managing member has actively sought to force the Master Tenant and Geneva out of the facility, through various means, so the landlord could lease the Facility with a higher rent.

6.    In September 2019, Anthem issued Geneva a network termination letter.  In an effort to remain in the network and increase skilled census Geneva sought to construct and operate

---

[1] Over-bedded meaning there are significantly more licensed beds in the county relative to demand.

a dialysis den. This strategy had been successful at another VRC managed facility. Geneva negotiated an agreement to build and operate the dialysis den contingent on landlord's approval. While Landlord was initially receptive, it eventually denied approval stating, "nothing would be done to the facility until the lease runs out."

7.     After this rejection, it became apparent that profitable operations for Geneva would not be possible, and in January 2020, the Landlord was offered the opportunity to purchase the membership units of the operator – this was done in order to keep the nursing home license and payor contracts intact so another operator could come in immediately. This offer was rejected. Geneva terminated the sublease with the Master Tenant effective March 1, 2020. Geneva has continued to operate at the Facility without a lease.

8.     Around the termination of the sublease, the Covid-19 pandemic started creating significant additional expenses. Due to the nature of the pandemic, staffing and personal protective equipment expenses skyrocketed while census sharply declined. Fortunately, Geneva was able to secure a substantial amount of government funding which was used to put into operations (payroll, supplies, food, utilities, patient care). All loans have already been forgiven. Even with these additional funds, which have been spent, Geneva has been reliant on loans from other affiliates to maintain its high level of resident care; without paying rent or the consulting fee. In January 2021, Geneva recorded a loss of over $97,000 in cash and cash equivalents. In March 2021 a required Change of Provider Letter (CHOP) was filed with the Ohio Department of Health which triggered withholding of all subsequent Medicaid payments pending audit. Geneva is unable to meet its financial obligations as they become due.

9.     Geneva, Master Tenant, VRC and an additional party are in litigation with the Landlord relating to lease payments, enforcement of the lease guaranty, and other claims. The

-4-

Landlord has sought a prejudgment attachment of Geneva's cash receipts which would cause an immediate shutdown of its operations and the immediate relocation of all of its residents. The Debtors commenced the instant chapter 11 cases to prevent the harm that would be caused by the abrupt shutdown of Geneva's operations and relocation of its 35 residents.

## II. The Debtors' Need for Unsecured Postpetition Financing and Description of DIP Facility

10.      The Debtors require unsecured postpetition financing (pursuant to section 364(c)(1) of the Bankruptcy Code) to pay regular daily expenses, including employees' wages, utilities, and other costs of doing business. In anticipation of transferring the facility to another nursing home operator, the operating Debtor, Geneva Village Retirement Community, Ltd. issued a "change of provider" or "CHOP Letter". As a result of the CHOP Letter, the State of Ohio began escrowing certain Medicare/Medicaid reimbursement payments that would otherwise be made to the Debtor until such time as the State of Ohio can complete its audit of Ohio Geneva's operation of the Nursing Home. That has resulted in the Debtor having nearly no cash flow.

11.      The DIP Facility, as set forth in the DIP Agreement attached hereto as Exhibit A and the Interim Order attached hereto as Exhibit B, will provide the Debtors with sufficient funds to allow the Debtors to operate their business and continue to serve its residents.

12.      The DIP Facility will be provided by Andover Village Retirement Community, LTD (the "DIP Lender"). The DIP Lender is an affiliate of the Debtors because it has common ownership.

13.      The Debtor will show that, if it is authorized to borrow under the DIP Facility, it will be able to continue its operations. The Debtor will also show that, if it is unable to borrow

-5-

under the DIP Facility, it will immediately run short of funds and be forced to shut down causing harm to its residents.

14.     The terms and conditions under which the DIP Lender will provide financing are fair and reasonable under the circumstances. Obtaining credit as requested herein is reasonable and necessary to continue the Debtors' business operations and to preserve its bankruptcy estate. No other source of funding is available to the Debtor under 364(b) because of the financial condition of the Debtors as outlined above. Thus, the Debtors believe that the entry of an order granting the interim and final relief requested in this Motion is in the best interests of its estate and creditors.

15.     The Court's approval of the DIP Facility described above: (a) will minimize the financial pressure on the Debtors' business that would otherwise result from the absence of interim debtor in possession financing; (b) will increase the likelihood that the Debtors will be able to continue to operate; and (c) is necessary to avoid immediate and irreparable harm to the Debtors and their assets, business, goodwill, reputation, employees, and creditors. For these reasons, approval of the DIP Facility evidenced thereby is in the best interests of the Debtors, their estates and their creditors.

### III.  The Necessity for Both Interim and Final Relief

16.     Absent borrowing under the DIP Facility, the Debtors will not have sufficient funds to meet their immediate working capital needs. Consequently, the Debtors require immediate debtor in possession financing to finance their business operations and meet ongoing cash and credit needs during the pendency of its chapter 11 case. During the period between the interim hearing on this Motion and the final hearing, the Debtors require immediate authority to borrow, under the DIP Facility, sufficient funds to meet its financing needs. Any denial of the financing

-6-

contemplated by the DIP Facility would prevent the Debtors from continuing to operate thereby substantially (and perhaps irreparably) impairing their ability to effectuate a successful reorganization. Thus, the relief requested in this Motion is essential to the Debtors' short-term survival and the Debtors' ultimate ability to reorganize successfully.

## IV. **Request for Interim Relief**

17. Use of the DIP Facility represents the Debtors' sole source of operating funds and working capital. Without the right to borrow under the DIP Facility, the Debtor would be forced to close and relocate all of its residents. The Debtors seek, therefore, after a preliminary hearing, immediate authority to borrow under the DIP Facility to avoid immediate and irreparable harm to the Debtors and their estates.

## V. **Notice**

18. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the United States Trustee; (b) and (c) the District Director of Internal Revenue; (e) any party claiming an interest in the Debtors' assets. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

19. The Debtors further request that the Court deem service of this Motion, pursuant to Bankruptcy Rule 4001(b)(1) and 4001(c)(1) and service of the Interim Order, good and sufficient notice of the final hearing.

## VI. **No Prior Request**

20. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an Order after a preliminary hearing: (a) authorizing unsecured postpetition financing under the DIP Facility on a

superpriority basis in an amount sufficient to avoid immediate and irreparable harm to the Debtors and their estates; (b) after a final hearing, enter a final order authorizing unsecured post-petition financing under to the DIP Facility on a superpriority basis; and (c) granting the Debtors such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Anthony J. DeGirolamo
Anthony J. DeGirolamo (0059265)
3930 Fulton Dr., N.W., Ste. 100B
Canton, Ohio 44718
Telephone:  330-305-9700
Facsimile:  330-305-9713
Email:  tony@ajdlaw7-11.com

PROPOSED COUNSEL FOR THE
DEBTOR AND DEBTOR IN
POSSESSION

**EXHIBIT A**

21-50498-amk    Doc 12    FILED 03/30/21    ENTERED 03/30/21 09:34:56    Page 9 of 40

## S SUPER PRIORITY DEBTOR-IN-POSSESSION
## LOAN AGREEMENT

This SUPER PRIORITY DEBTOR-IN-POSSESSION PRIMING LOAN AGREEMENT ("Agreement") is dated as of March ___, 2021 and is by and among Geneva Village Retirement Community, LTD, an Ohio limited liability company (the "Operator") a for profit entity and will become a debtor-in-possession under the Bankruptcy Code (as defined below) ("Borrower"), and Andover Village Retirement Community, LTD as lender (the "DIP Lender").

## RECITALS

WHEREAS, Borrower will file voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court (the "Bankruptcy Court") on or about March 30, 2021 (the date of filing to be known as the "Petition Date");

WHEREAS, Borrower will be continuing in the possession of its assets and in the management of its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Before the Petition Date, Borrower entered into a certain Promissory Note as of February 28, 2021 (the Pre-petition Loan Agreement") by and among Borrower and Lender, pursuant to which the Lender had extended credit to Borrower on the terms and conditions described therein.

WHEREAS, as of the Petition Date, DIP Lender is owed approximately $100,000 in obligations incurred directly by Borrower on the Pre-Petition Loan Agreement (the "Pre-petition Secured Debt").

WHEREAS, Borrower has requested DIP Lender to provide a revolving credit facility (the "DIP Facility") to Borrower in an amount not to exceed the aggregate principal amount of Two Hundred Fifty Thousand Dollars ($250,000) for the purposes described herein; and

 WHEREAS, DIP Lender is willing to make the requested DIP Facility available on the terms and conditions set forth in this Agreement, and so long as a. all post-petition credit obligations, to the extent provided herein, are given superpriority status as is provided in the Interim Financing Order and Final Financing Order.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, Borrower and DIP Lender agree as follows:

    1. **Definitions**. The terms listed below shall be defined as follows:

"$", "USD" and "dollars" denotes the lawful currency of the United States of America.

"Advance" means a borrowing hereunder, made by DIP Lender to Borrower on a Borrowing Date pursuant to a Borrowing Request and other requirements of Section 2.

"Approved Budget" shall have the meaning set forth in Section 9(a) hereof.

"<u>Availability Period</u>" means the period from the Closing Date to, but excluding, the Maturity Date.

"<u>Available Commitment</u>" means, at any time, the Commitment minus the outstanding aggregate total of the Loans at such time.

"<u>Banking Day</u>" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in Akron, Ohio are authorized or required by Law to remain closed.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"<u>Bankruptcy Court</u>" shall have the meaning set forth in the recitals.

"<u>Borrowing Date</u>" means a date on which an Advance is made hereunder.

"<u>Borrowing Request</u>" means a Borrowing Request in the form attached hereto as <u>Exhibit A</u>, or such other form acceptable to DIP Lender.

"<u>Budget</u>" shall mean the Initial Approved Budget and each subsequent Approved Budget.

"<u>Carve-Out</u>" shall mean an amount equal to the sum of the following: (a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (b) to the extent allowed by the Bankruptcy Court at any time, and subject to the Budget, all accrued and unpaid fees, disbursements, costs and expenses of professionals or professional firms retained by Borrower and any official committee of creditors accrued or incurred at any time before or on the date and time of the delivery by DIP Lender of a Carve Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice, <u>plus</u> fees, costs, and expenses incurred by the aforementioned professionals after the date of the Carve-Out Trigger Notice in an amount not to exceed $50,000 in the aggregate, unless agreed to by the DIP Lender; plus, in all cases, whether before or after the date of the Carve-Out Trigger Notice, payable to those professionals entitled to the Carve Out under this Agreement.

"<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by DIP Lender to Borrower and its counsel, the U.S. Trustee, and lead counsel to any official committee, which notice may be delivered following the occurrence of an Event of Default.

"<u>Chapter 11 Cases</u>" shall mean the cases to be filed under Chapter 11 of the Bankruptcy Code by Borrower in its capacity as a debtor and debtor-in-possession in the Bankruptcy Court.

"<u>Closing Date</u>" shall mean the first Banking Day following the satisfaction of Conditions to Effectiveness as set forth in Section 5 hereof and the advance of funds by DIP Lender.

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended.

"<u>Commitment</u>" means the obligation of DIP Lender to make Loans to Borrower in an aggregate amount not exceeding Two Hundred Fifty-Thousand $250,000.

"<u>Default</u>" shall mean any condition or event that, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"<u>DIP Financing Order</u>" means the Interim Order or the Final Order, as may be applicable.

"<u>DIP Lender Carve-Out</u>" shall mean on any date an amount equal to the aggregate Carve-Out on such date.

"<u>DIP Loan Documents</u>" shall mean this Agreement, the DIP Financing Order, and any other documents, instruments of the Loans, or in connection with, or as support for, any of the foregoing, whether by a Borrower or a Third Party, and any updates or renewals thereof.

"<u>Event of Default</u>" shall have the meaning set forth in <u>Section 10</u> hereof.

"<u>Excluded Taxes</u>" shall mean (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed by the United States of America or the jurisdiction where DIP Lender's applicable lending office is located, (ii) U.S. Federal withholding Taxes imposed on amounts payable hereunder pursuant to the Law in effect as of the date of this Agreement, and (iii) U.S. Federal withholding Taxes imposed under FATCA.

"<u>FATCA</u>" shall mean Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version of such sections that are substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"<u>Final Order</u>" shall mean a final, non-appealable order of the Bankruptcy Court approving the DIP Facility, in form and substance satisfactory to DIP Lender in its reasonable discretion.

"<u>Indemnified Taxes</u>" shall mean (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under this Agreement or any other DIP Loan Document, and (ii) without duplication of any Taxes covered in subclause (i) of this definition, Other Taxes.

"<u>Initial Approved Budget</u>" shall mean the Budget attached hereto as <u>Exhibit B</u>.

"<u>Interim Order</u>" shall mean an interim order of the Bankruptcy Court approving the DIP Facility and entered in the Chapter 11 Case, in form and substance satisfactory to DIP Lender in its reasonable discretion.

"<u>Law</u>" shall mean any international, foreign, Federal, state or local statute, treaty, rule, guideline, regulation, ordinance, code, or administrative or judicial precedent or authority, including the interpretation or administration thereof by any governmental authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any governmental authority, in each case whether or not having the force of law.

"<u>Lien</u>" shall mean, with respect to any asset, any mortgage, pledge, hypothecation, assignment, deposit arrangement, lien (statutory or other) or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable Laws of any jurisdiction).

"<u>Loans</u>" means the Advances made by DIP Lender to Borrower pursuant to this Agreement.

"<u>Main Office</u>" means the main office of DIP Lender, currently located at 405 Tallmadge Road, Cuyahoga Falls, Ohio or such other location as DIP Lender may designate as its main office.

"<u>Material Adverse Effect</u>" means any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singularly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, resulting in a material adverse change in, or a material adverse effect on, (i) the business, results of operations, financial condition, assets, liabilities or prospects of Borrower taken as a whole (other than the commencement of the Chapter 11 Case and the continuation of the Chapter 11 Case), (ii) the ability of any Borrower to perform any of its respective obligations under the DIP Loan Documents, (iii) the rights and remedies of DIP Lender under any of the DIP Loan Documents, (iv) the legality, validity or enforceability of any of the DIP Loan Documents or the DIP Financing Order, or (v) the value of the Collateral.

"<u>Maturity Date</u>" means the earliest of (i) June 1. 2021, (ii) if the Final Order has not been entered within thirty (30) days after the Interim Order, the thirtieth (30th) day after the date the Interim Order is entered, unless agreed to by the DIP Lender and (iii) the date of the acceleration of the Loans and/or the termination of the Commitment pursuant to <u>Section 10</u>.

"<u>Obligations</u>" shall mean all amounts owing by Borrower to DIP Lender pursuant to or in connection with this Agreement or any other DIP Loan Document including, without limitation, all principal, interest, fees, expenses, indemnification and reimbursement payments, costs and expenses (including all reasonable fees and expenses of counsel to DIP Lender incurred pursuant to this Agreement or any other DIP Loan Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising hereunder or thereunder.

<u>Other Taxes</u>" means, collectively, all present or future stamp, court, or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the

execution, delivery, performance, enforcement, or registration of, from the receipt of security interests in, or otherwise with respect to this Agreement or any other DIP Loan Document.

"Payment Date" means the first Banking Day of each month.

"Permitted Variance" means (i) any favorable variance, (ii) an unfavorable variance of not more than 15% with respect to (A) any disbursement line item or (B) the aggregate cash receipts, and (iii) an unfavorable variance of not more than 10% with respect to combined aggregate receipts and disbursements; provided, however, that it shall also be a Permitted Variance if there is an unfavorable variance of any amount with respect to aggregate receipts or combined aggregate receipts and disbursements for a weekly Testing Period as long as any unfavorable variance is not more than the 15% and 10% variance thresholds described above for the respective cumulative Testing Period. Any amounts or expenses identified in the Budget that are unused in any week or interim period may be carried over and used by the Debtors in any subsequent week or interim period with respect to the same line item.

"Plan" means a plan of reorganization filed by Debtors in accordance with the Bankruptcy Code in a form and substance reasonably acceptable to DIP Lender.

"Requirements of Law" shall mean, as to Borrower, the articles or certificate of incorporation and by-laws or other organizational or governing documents of Borrower, and each federal, state, local and foreign law, treaty, rule or regulation or determination of an arbitrator or a court or other governmental authority, in each case applicable to or binding upon Borrower or any of their property or to which Borrower or any of their property is subject.

"Superpriority DIP Claims" shall mean all of the claims of DIP Lender on account of the Obligations, which claims shall be entitled to the benefits of Section 364(c)(1) of the Bankruptcy Code, having a superpriority over any and all administrative expenses of the kind that are specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code, subject to the Carve-Out.

"Tax" or "Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholding (including backup withholding), assessments, fees, value added tax or any other goods, services, use or sales tax, or other charges imposed by any governmental authority, including, without limitation, any interest, additions to tax, or penalties applicable thereto.

"Testing Period" shall have the meaning set forth in Section 9(j) hereof.

"Third Party" shall mean any party liable with respect to, or otherwise granting support for, this Agreement, whether by guaranty, subordination, grant of security or otherwise.

"Third Party Lienholder" shall have the meaning set forth in Section 4(a)(ii) hereof.

"Variance Report" shall have the meaning set forth in Section 9(a) hereof.

Unless otherwise defined herein or the context otherwise requires, any terms that are not capitalized and used herein, but which are defined in the UCC, have the respective meanings provided in the UCC including, without limitation: (i) as-extracted collateral; (ii) certificated security; (iii) chattel paper; (iv) documents; (v) electronic chattel paper; (vi) financial assets; (vii) goods, (viii) instruments; (ix) inventory; (x) investment property; (xi) payment intangibles; (xii) proceeds; (xiii) securities account; (xiv) securities intermediary; (xv) security; (xvi) security certificate; (xvii) security entitlements; and (xviii) uncertificated security.

## 2. Credit Facility.

(a) <u>Commitment</u>.  Subject to the terms and conditions set forth herein (including the conditions to borrowing set forth in <u>Sections 5</u> and <u>6</u> hereof), DIP Lender agrees to make Loans to Borrower, from time to time during the Availability Period, provided that aggregate Advances shall not exceed the then Available Commitment.  The initial draw shall not exceed the aggregate amount of $150,000, pursuant to Bankruptcy Court approval, which shall be used to pay approved amounts as set forth in the Budget to cover two weeks of operations. During the Availability Period, Borrower shall be entitled to borrow and to prepay Loans in accordance with the terms and conditions of this Agreement; <u>provided</u>, <u>however</u>, that (i) Borrower may not borrow any amounts hereunder should an Event of Default exist; and (ii) Borrower may not re-borrow Loans that have been prepaid.  The Commitment shall terminate on the Maturity Date and DIP Lender shall have no further obligation to make Advances to Borrower.

(b) <u>Advances; Minimum Amount of Each Advance</u>.  Other than with respect to the initial draw, the Borrower, shall give DIP Lender irrevocable notice of each borrowing by delivering a Borrowing Request by 11:00 a.m. prevailing Eastern time not less than one (1) Banking Day prior to the date of each requested Advance; <u>provided</u>, <u>however</u>, that (i) no Loan shall be in an amount less than $25,000, (ii) unless agreed to by the DIP Lender Borrower shall not be permitted to deliver a Borrowing Request more frequently than once per calendar week, and (iii) Borrower shall not be permitted to request Loans (and DIP Lender shall not be required to fund Loans) in excess of Borrower's cash needs for the two (2) calendar weeks immediately following the date of the Borrowing Request (as set forth in an Approved Budget).

(c)      <u>Payment Upon Maturity Date</u>.      Borrower hereby promise to pay to the order of DIP Lender at its Main Office the principal amount of all outstanding Loans as of and when due, either consistent with this Agreement or on the Maturity Date or as agreed to by the DIP Lender and the Debtors, plus all accrued interest, fees and other Obligations then outstanding.

(d) <u>Repayment of Advances</u>.  Borrower shall have the right to repay Advances at any time or from time to time, <u>provided that</u>:  (i) Borrower shall give DIP Lender irrevocable notice of each prepayment by 11:00 a.m. prevailing Eastern time, not less than two (2) business days prior to the date of prepayment of a Loan; and (ii) all prepayments of Loans shall be in a minimum amount equal to the lesser of $25,000 or the unpaid principal amount of the Loans outstanding under this Agreement.

(e) Notes. The Commitment shall be evidenced by one or more promissory notes in such form as is reasonably acceptable to DIP Lender executed by Borrower and payable to DIP Lender, as such notes may be amended from time to time, including any and all promissory notes which may be issued to DIP Lender after the date of this Agreement (each a "Note," and collectively the "Notes"). Neither an original or a copy of any Note shall be required to establish or prove any Obligation. In the event any Note is lost, mutilated or destroyed, Borrower shall execute a replacement thereof and deliver such replacement to DIP Lender upon demand.

3. **Interest Payment, Interest Payment Date, Interest and Fees.**

(a) Interest. Each advance shall bear interest on the outstanding principal amount thereof, for each day from and including the date such Advance is made at a rate per annum equal to five percent (5%) (the "Interest Rate").

(b) Rates Applicable After Default; Late Payment. Notwithstanding anything to the contrary herein, after the occurrence of an Event of Default, DIP Lender may, at its sole option, by notice to the Borrower, declare that no Advance be made. After the occurrence and during the continuance of a Default, DIP Lender may, at its option, declare that each Advance shall bear interest at the default rate of interest, which equals the Interest Rate plus 5% per annum (the "Default Rate"). Any payment required to be made by Borrower under this Agreement which is not made within five (5) days of the Payment Date or date payment is due shall be subject to a late charge equal to 5% of the amount of the payment.

(c) Payment Date. Interest accrued on each Advance shall be payable on each Payment Date, commencing with the first such date to occur after the date hereof and at maturity. Interest shall be due and payable on the Maturity Date and shall be calculated on the basis of a year of 360 days for the actual number of days elapsed. All payments hereunder shall be made in lawful money of the United States and in immediately available funds. Any extension of time for the payment of the interest of this Agreement resulting from the due date falling on a non-Banking Day shall be included in the computation of interest. The date, amount, and the interest rate with respect to each Loan evidenced hereby and all payments of principal thereof shall be recorded by DIP Lender on its books and, at the discretion of DIP Lender prior to any transfer of this Agreement at any other time, may be endorsed by DIP Lender on a schedule. Any such endorsement shall be conclusive absent manifest error. Borrower waives presentment, notice of dishonor, protest and any other notice or formality with respect to this Agreement.

4. **Intentionally Left Blank**

5. **Conditions To Effectiveness**. The obligation of DIP Lender to make Loans shall not become effective until the date on which each of the following conditions is satisfied (or waived in the absolute discretion of DIP Lender):

(a) DIP Lender (or its counsel) shall have received the following (i) a counterpart of this Agreement signed by each Borrower; (ii) an executed copy of the Note(s) signed by each Borrower; (iii) copies of duly executed resolutions, in form and substance satisfactory to DIP

Lender in its reasonable discretion, of the board of directors (or similar governing body) of each Borrower authorizing the execution, delivery and performance of the DIP Loan Documents to which it is a party; (iv) a duly executed Borrowing Request with respect to any Loan made on the Closing Date.

(b) All legal matters incident to this Agreement and the borrowings hereunder shall be reasonably satisfactory to DIP Lender.

(c) All motions and other documents to be filed with and submitted to the Bankruptcy Court related to the DIP Facility and the approval thereof shall be in form and substance satisfactory to DIP Lender in its reasonable discretion, and .

(d) The Bankruptcy Court shall have entered the Interim Order, in form and substance satisfactory to DIP Lender in its reasonable discretion.

**6**. **Conditions to All Credit Extensions.** The obligation of DIP Lender to make a Loan on the occasion of any borrowing is subject to the satisfaction of each of the conditions set forth in <u>Section 5</u> on the date of such Loan (other than those conditions expressly required to be satisfied on the Closing Date) and the following additional conditions:

(a) The Petition Date shall have occurred.

(b) Borrower shall have delivered to DIP Lender an appropriate Borrowing Request, duly executed and completed, by the time specified in, and otherwise as permitted by, this Agreement.

(c) The representations and warranties made by Borrower herein shall be true and correct in all material respects at and as if made as of such date (in each case immediately prior to, and after giving effect to, the funding of any Loans) except to the extent they expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all respects on and as of such earlier date.

(d) No Default or Event of Default shall exist or be continuing either prior to or after giving effect to the making of such Loan.

(e) The making of such Loan (and the use of the proceeds therefrom) shall not violate any Law and shall not be enjoined, temporarily, preliminarily or permanently.

(f) No Material Adverse Effect shall have occurred.

(g) The making of such Loan complies with the Budget, in all respects, or has otherwise been approved in writing by DIP Lender.

(h) With respect to any Loans made after the Closing Date, the DIP Financing Order shall have been entered approving the DIP Facility, in form and substance satisfactory to DIP Lender in its reasonable discretion, which DIP Financing Order shall be in full force and effect and shall not have been

reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of DIP Lender.

(i)     Any Law, ruling, judgment, order, injunction or other restraint exists that, in the reasonable judgment of DIP Lender, prohibits, restricts or imposes a materially adverse condition on Borrower, the DIP Facility or the exercise by DIP Lender of its rights as a secured party with respect to the Collateral.

(j)     Any borrowing hereunder shall be limited to the amount that is required to fund disbursements permitted under the Budget or otherwise available for use by Borrower.

The delivery of each Borrowing Request shall constitute a representation and warranty by Borrower of the satisfaction of each of the conditions specified in subsections (c) through (j) above.

**7.     Indemnified Taxes.**    Borrower agrees that all payments made pursuant to or on account of this Agreement or any other DIP Loan Document shall be made by Borrower free and clear and without deduction or withholding for any Tax, except as required by applicable Law.  If any applicable Law requires the deduction of or withholding of any Tax from any such payment, then Borrower shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by Borrower pursuant to or on account of this Agreement or any other DIP Loan Document shall be increased as necessary so that after such deduction or withholding has been made (including any such deduction or withholding that may be applicable to additional sums payable under this Section) DIP Lender shall receive an amount equal to the amount it would have received had no such deduction or withholding been made. Borrower shall provide to DIP Lender evidence of such payment made to the relevant governmental authority within thirty (30) days thereof and shall also provide to DIP Lender any official tax receipt or other documentation issued by the appropriate governmental authorities with respect to the payment of Indemnified Taxes.  Borrower hereby agrees that it shall, jointly and severally, indemnify and reimburse DIP Lender, on demand, for any loss, liability, or expense incurred by DIP Lender as a result of any failure by Borrower to pay Indemnified Taxes as and when due, whether or not such Indemnified Taxes were correctly or legally imposed by the relevant governmental authority.  Borrower shall timely pay to the relevant governmental authority or, at the option of DIP Lender, reimburse it for Other Taxes.

**8**.     **Representations.**

Borrower represents and warrants that:

(a)     Upon approval of the Bankruptcy Court, the DIP Loan Documents constitute the legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their terms.

(b)     Upon approval of the Bankruptcy Court, the execution, delivery and performance by Borrower of the DIP Loan Documents and all other documents contemplated hereby or thereby, and the use of the proceeds of any of the Loans, do not and will not, subject to the use of proceeds used

to pay off prior secured obligations: (i) conflict with or constitute a breach of, or default under, or require any consent under, or result in the creation of any Lien, charge or encumbrance upon the property or assets of any Borrower pursuant to any other agreement or instrument (other than any pledge of or security interest granted in any Collateral pursuant to any DIP Loan Document) to which any Borrower is a party or is bound or by which its properties may be bound or affected; or (ii) violate any provision of any Law (including, without limitation, Regulation U of the Federal Reserve Board), order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to any Borrower.

(c) Upon entry of the Interim Order (with respect to the interim borrowings) and upon entry of the Final Order, no consent, approval or authorization of, or registration, declaration or filing with, any governmental authority or other person or entity is required as a condition to or in connection with the due and valid execution, delivery and performance by Borrower of any DIP Loan Document.

(d) Borrower is in compliance with all Requirements of Law, except to the extent that the failure to comply therewith would not, in the aggregate, be reasonably expected to have a Material Adverse Effect.

(e) Borrower is or will be as of the Closing and as of the date of any Advance in compliance with the terms and conditions of the DIP Financing Orders. Each of the Interim Orders (to the extent necessary, with respect to the period prior to the entry of the Final Order) or the Final Order (from after the date the Final Order is entered) is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of DIP Lender, in its reasonable discretion, amended or modified and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

(f) A true and complete copy of the Initial Approved Budget, as agreed to with DIP Lender as of the Closing Date, is attached as Exhibit B hereto.

Each borrowing request by Borrower under this Agreement shall constitute a representation and warranty that the statements above are true and correct both on the date of such request and on the date of the borrowing. Each borrowing request shall also constitute a representation that no Default or Event of Default under this Agreement has occurred and is continuing or would result from such borrowing.

9. **Covenants**.

Borrower agrees that so long as DIP Lender has any Commitment hereunder or any Obligation or other amount payable hereunder or under any DIP Loan Document (in each case other than contingent indemnification obligations) remains unpaid:

(a) Borrower shall provide to DIP Lender: (i) monthly consolidated unaudited financial statements of Borrower within thirty (30) days of month-end, certified by the Chief Financial Officer or approved signatory; (ii) quarterly consolidated unaudited financial statements of Borrower within forty-five (45) days of fiscal quarter-end, certified by the Chief Financial Officer; (iii) every four weeks after the Closing Date, an updated 13-week cash flow forecast, in each case, in form and

-10-

substance satisfactory to DIP Lender in its reasonable discretion (each such forecast approved by DIP Lender, an "Approved Budget") for the subsequent 13 week period consistent with the form of the Initial Approved Budget; (iv) beginning on the second Wednesday following the Closing Date and on each Wednesday following, a variance report (the "Variance Report") setting forth actual cash receipts and disbursements of Borrower for the prior week and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such week as compared to the Initial Approved Budget or the most recently Approved Budget delivered prior to such Variance Report (as applicable) on a weekly and cumulative basis, and each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer or approved signatory of Borrower. Borrower will promptly provide notice to DIP Lender of the existence of any Material Adverse Effect and of any event, occurrence of circumstance that could reasonably be expected to result in a Material Adverse Effect.

(b)     Further, Borrower will provide to DIP Lender such other reports and information as may be reasonably requested by DIP Lender. In addition, Borrower will use reasonable efforts to cause their accountants, financial advisors, consultants and parties providing management services to Borrowers to cooperate, consult with and provide to DIP Lender all such information as may be reasonably requested with respect to the businesses, results of operations, and financial condition of Borrowers.

(c)  Except for and to the extent permitted under the DIP Financing Orders, Borrower will not, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien which is *pari passu* of DIP Lender against Borrower hereunder or under the DIP Financing Order, or apply to the Bankruptcy Court for authority to do so.

(d)   Borrower will not, directly or indirectly (i) seek, support, consent to or suffer to exist any modification, stay, vacation or amendment of the Interim Order or the Final Order except for any modifications and amendments agreed to in writing by DIP Lender, (ii) apply to the Bankruptcy Court for authority to take any action prohibited by this Agreement (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of DIP Lender) or (iii) seek authorization for, or permit the existence of, any claims other than that of DIP Lender entitled to a superpriority under Section 364(c)(1) of the Bankruptcy Code that is senior or *pari passu* with DIP Lender's Section 364(c)(1) claim, other than the Carve-Out.

(e)  Borrower shall not make or commit to make payments to critical vendors (other than those critical vendors that are approved in writing by DIP Lender) in respect of prepetition amounts in excess of the amount included in the Budget.

(f)     Borrower will provide notice to DIP Lender of, and reasonably consult with DIP Lender regarding, any plans and motions to assume or reject executory contracts or unexpired leases.

(g)   Except as otherwise provided herein or approved by DIP Lender, Borrower will not, and will not permit any subsidiary to directly or indirectly (i) use any cash or the proceeds of any Loans in a manner or for a purpose other than those consistent with this Agreement, the DIP Financing Order and the Budget, (ii) permit a disbursement that would cause any Budget variance that would not

otherwise constitute a Permitted Variance without the prior written consent of DIP Lender or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or debt arising prior to the Petition Date other than payments authorized by the Bankruptcy Court and in compliance with the Budget.

(h)   Unless as provided in the DIP Order, no Collateral or proceeds of Loans may be used directly or indirectly by Borrower, any committee, any trustee or other estate representative appointed in the Chapter 11 Case (or any successor case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

(i)   to seek authorization to obtain Liens that are senior to, or on a parity with, the Liens in favor of DIP Lender or the Superpriority DIP Claims (except to the extent expressly set forth in this Agreement); or

(ii)   to prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of DIP Lender, in its capacity as DIP Lender or otherwise, its controlling persons, affiliates or successors or assigns, and each of the respective officers, directors, employees, agents, attorneys, or advisors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the Superpriority DIP Claims or the DIP Loan Documents, (D) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the Obligations, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to DIP Lender in the DIP Financing Orders or under any of the DIP Loan Documents.

(j)   Borrower shall remain in material compliance with the Initial Approved Budget and any subsequent Approved Budget for each Testing Period.  To comply with the Initial Approved Budget or any subsequent Approved Budget, Borrower (i) shall not exceed any disbursement line item set forth in the Initial Approved Budget or any subsequently Approved Budget, as applicable, for any Testing Period by more than the Permitted Variance, (ii) shall collect cash receipts (excluding proceeds of the DIP Facility that may be deemed a receipt) in an amount not less than the aggregate amount of such cash receipts in the Initial Approved Budget or any subsequently Approved Budget, as applicable, for each Testing Period (subject to the Permitted Variance), and (iii) shall not have combined net receipts and disbursements less than the combined net amount in the Initial Approved Budget or any subsequently Approved Budget, as applicable, for any Testing Period (subject to the Permitted Variance).  The Permitted Variance with respect to each Testing Period shall be determined and reported to DIP Lender not later than the Wednesday immediately following each such Testing Period.  Budget compliance shall be tested each week after the Closing Date and shall be tested on a weekly and cumulative basis from the Closing Date (each, a "Testing Period").

(k)  Except as otherwise provided herein or approved by DIP Lender, Borrower will not use any cash or the proceeds of the DIP Facility in a manner or for a purpose other than those consistent with an Approved Budget and this Interim Order.

(l)  To the extent permitted by the Bankruptcy Court, Borrower shall file their schedules and statement of affairs with the Bankruptcy Court no later than twenty-eight (28) days after the Petition Date.

## 10.  Events of Default.

 If any of the following events of default shall occur (each an "Event of Default"):

(a)  Borrower shall fail to pay (i) the principal of this Agreement as and when due and payable within five (5) days of when it is due, or (ii) interest on this Agreement, or any other amount payable under this Agreement, as and when due and payable within five (5) days of when it is due.

(b)  Any representation or warranty made or deemed made by Borrower in this Agreement or by Borrower or any Third Party in any DIP Loan Document to which it is a party, or in any certificate, document, opinion or financial or other statement furnished under or in connection with a DIP Loan Document, shall prove to have been incorrect in any negative material respect on or after the date hereof.

(c)  Borrower or any Third Party shall fail to perform or observe any material term, covenant or agreement contained in any DIP Loan Document on its part to be performed or observed, and fails to cure said Event of Default within five (5) days after occurrence of a monetary default and thirty (30) days after occurrence of a non-monetary Event of Default.

(d)  Borrower or any Third Party is involved in a proceeding which would reasonably be expected to result in a forfeiture of all or a substantial part of any such party's assets or a material judgment is entered against Borrower or any Third Party.

(e)  Any of the following shall occur in any Chapter 11 Case:

(i)  Borrower shall file a plan of reorganization or liquidation under Chapter11 of the Bankruptcy Code that does not propose to indefeasibly repay the Obligations in full in cash, unless otherwise consented to by DIP Lender;

(ii)  Borrower shall file a pleading seeking to vacate or modify any of the DIP Financing Order without the prior written consent of DIP Lender;

(iii)  entry of an order without the prior consent of DIP Lender amending, supplementing or otherwise modifying any DIP Financing Order;

(iv) reversal, vacation or stay of the effectiveness of any DIP Financing Order;

(v)  any violation of the terms of any DIP Financing Order;

-13-

(vi) dismissal of any Chapter 11 Case or conversion of any Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code without the written consent of the DIP Lender;

(vii) appointment of a Chapter 11 trustee in any Chapter 11 Case without the consent of the DIP Lender;

(viii) Borrower shall seek to sell any of its assets outside the ordinary course of business without the DIP's prior written consent;

(ix) appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of Borrower without the prior written consent of DIP Lender;

(x) granting of relief from the automatic stay in the Chapter 11 Case to permit foreclosure or enforcement on, or any right or remedy with respect to, material assets of Borrower;

(xi) Borrower shall file (or support another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein) which is senior to or pari passu with DIP Lender's claims and Liens under the DIP Facility, other than the Carve-Out;

(xii) payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein or in the DIP Financing Orders;

(xiii) unless otherwise provided in the Interim Order or the Final Order, or upon the written permission of DIP Lender, Borrower shall seek or if there is entered, an order under Section 365 of the Bankruptcy Code rejecting a material lease that is part of (or whose premises contain any of ) the Collateral;

(g) Borrower shall use cash collateral or Loan proceeds for any item other than those set forth in, and in accordance with, the Budget and as approved by the Bankruptcy Court or prepay any pre-petition debt except as approved by the Bankruptcy Court and DIP Lender.

(h) Borrower shall fail to comply with any milestone set forth this paragraph 9(h), as follows (i) fails to file with the Bankruptcy Court a Disclosure Statement and Plan in a form and substance reasonably satisfactory to DIP Lender not later than 60 days after the Petition Date, (ii) fails to obtain an Order of the Bankruptcy Court approving the Disclosure Statement and solicitation of approval of the Plan in a form and substance reasonably satisfactory to DIP Lender not later than 60 days after the Petition Date, and (iii) fails to obtain an Order of the Bankruptcy Court confirming the Plan in a form and substance reasonably satisfactory to DIP Lender, and (iv) fails to meet any other deadlines or requirements set forth in Sections 9, 10 and 11 of this Agreement, without the written consent of DIP Lender to deviate from these requirements.

THEN, DIP Lender may deliver written notice to the Bankruptcy Court that the automatic stay provisions of Section 362 of the Bankruptcy Code have been vacated and modified to the extent

-14-

necessary to permit DIP Lender to exercise all rights and remedies provided for in the DIP Loan Documents, and after five (5) business days after such notice, to take, subject to the provisions of the DIP Financing Order, any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable):

(a)   declare the Commitment terminated whereupon the Commitment shall be immediately terminated;

(b)    declare the unpaid principal of and any accrued interest in respect of all Loans and any and all other indebtedness or obligations of any and every kind owing by Borrower to DIP Lender hereunder to be due whereupon the same shall be immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrower;

(c)    take any other actions or exercise any other rights or remedies permitted under the DIP Financing Order, the DIP Loan Documents or applicable Law to effectuate the repayment of the Obligations.

Borrower shall cooperate fully with DIP Lender in its exercise of rights and remedies. Borrower hereby waives any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of DIP Lender set forth in the DIP Financing Order and in the DIP Loan Documents.

In case any one or more of the covenants and/or agreements set forth in this Agreement or any other DIP Loan Document shall have been breached by Borrower, and not cured within any applicable notice and cure period, then DIP Lender may proceed to protect and enforce DIP Lender's rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other DIP Loan Document. Without limitation of the foregoing, Borrower agrees that failure to materially comply with any of the covenants contained herein will cause irreparable harm and that specific performance shall be available in the event of any breach thereof. DIP Lender acting pursuant to this paragraph shall be jointly and severally indemnified by Borrower against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses).

## 11. Certain Bankruptcy Matters.

(a)    Except to the extent provided otherwise in a DIP Financing Order, Borrower hereby agrees that the Obligations shall (i) constitute Superpriority DIP Claims over all administrative expense claims and unsecured claims against Borrower now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court, subject only to Carve-Out.

-15-

(b)  In the event of a conflict between, or inconsistency among, the Interim Order or the Final Order, on the one hand, and any other DIP Loan Document, on the other hand, the Interim Order or the Final Order, as the case may be, shall control.

(c)  Intentionally left Blank.

(d)  Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)  except to the extent provided in any of the DIP Financing Orders and subject to the DIP Financing Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of DIP Lender against Borrower in respect of any Obligations, but subject to the Carve-Out;

(ii)  upon the later of (A) the occurrence of an Event of Default and (B) the Maturity Date, DIP Lender shall be required to advance funds to the Debtor's estate in an amount sufficient to pay all accrued but unpaid administrative claims incurred in the ordinary course of the Debtor's business in accordance with the terms of the Approved Budget (subject to any Permitted Variance) arising in the time period between the effective date of the DIP Facility through the Maturity Date; provided, however, that the payment of such obligations in this Section 11(d)(iv) shall be in addition to the Carve-Out."

## 12.  Intentionally Left Blank

## 13.  Intentionally Left Blank.

## 14.  CONSENT TO JURISDICTION.  BORROWER HEREBY CONSENTS TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF OHIO AND IRREVOCABLY AGREES THAT, SUBJECT TO DIP LENDER'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS.  BORROWER EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON BORROWER BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER, AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED. IN ANY LITIGATION, TRIAL, ARBITRATION OR OTHER DISPUTE RESOLUTION PROCEEDING RELATING TO THIS AGREEMENT OR ANY OF THE OTHER DIP LOAN DOCUMENTS, ALL DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS OF BORROWERS OR ANY OF THEIR AFFILIATES SHALL

BE DEEMED TO BE EMPLOYEES OR MANAGING AGENTS OF BORROWER FOR PURPOSES OF ALL APPLICABLE LAW OR COURT RULES REGARDING THE PRODUCTION OF WITNESSES BY NOTICE FOR TESTIMONY (WHETHER IN A DEPOSITION, AT TRIAL OR OTHERWISE). BORROWER AGREES THAT DIP LENDER'S COUNSEL IN ANY SUCH DISPUTE RESOLUTION PROCEEDING MAY EXAMINE ANY OF THESE INDIVIDUALS AS IF UNDER CROSS-EXAMINATION AND THAT ANY DISCOVERY DEPOSITION OF ANY OF THEM MAY BE USED IN THAT PROCEEDING AS IF IT WERE AN EVIDENCE DEPOSITION. BORROWER IN ANY EVENT WILL USE ALL COMMERCIALLY REASONABLE EFFORTS TO PRODUCE IN ANY SUCH DISPUTE RESOLUTION PROCEEDING, AT THE TIME AND IN THE MANNER REQUESTED BY DIP LENDER, ALL PERSONS, DOCUMENTS (WHETHER IN TANGIBLE, ELECTRONIC OR OTHER FORM) OR OTHER THINGS UNDER THEIR CONTROL AND RELATING TO THE DISPUTE.

**15. WAIVER OF JURY TRIAL.**

EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**16. Miscellaneous.**

(a)  The provisions of this Agreement are intended to be severable.  If for any reason any provisions of this Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions thereof in any jurisdiction.

(b)  No amendment, modification, supplement or waiver of any provision of this Agreement nor consent to departure by Borrower therefrom shall be effective unless the same shall be in writing and signed by Borrower and DIP Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(c)   No failure on the part of DIP Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof or preclude any other or further exercise thereof or the exercise

-17-

of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by Law.

(d)   As used herein, the term Borrower shall include all signatories hereto in such capacity, if more than one. In such event, the obligations, representations and warranties of Borrower hereunder shall be joint and several. This Agreement shall be binding on Borrower and its respective successors and assigns and shall inure to the benefit of DIP Lender and its successors and assigns, except that Borrower may not delegate any of their obligations hereunder without the prior written consent of DIP Lender. With the consent of Borrower, not to be unreasonably withheld, DIP Lender may assign all or a portion of its rights and obligations under this Agreement; provided that such consent shall not be required (i) at any time that an Event of Default has occurred and is continuing, (ii) in connection with any assignment to an affiliate of DIP Lender, or (iii) in connection with any merger or consolidation.

(e)   Anything herein to the contrary notwithstanding, the obligations of Borrower under this Agreement shall be subject to the limitation that payments of interest shall not be required to the extent that receipt thereof would be contrary to provisions of Law applicable to DIP Lender limiting rates of interest which may be charged or collected by DIP Lender.

(f)   Unless otherwise agreed in writing, notices shall be given to DIP Lender and Borrower at its address set forth in the signature page of this Agreement, or such other address communicated in writing by either such party to the other. Notices to DIP Lender shall be effective upon receipt.

(g)  The obligations of Borrower under Sections 7, 13, 14 and 15 hereof shall survive the repayment of the Loans.

(h)   Each reference herein to DIP Lender shall be deemed to include its successors, endorsees, and assigns, in whose favor the provisions hereof shall inure. Each reference herein to Borrower shall be deemed to include the respective heirs, executors, administrators, legal representatives, successors and assigns of Borrower, all of whom shall be bound by the provisions hereof.

**17.**   GOVERNING LAW:  THIS AGREEMENT SHALL BE CONSTRUED,
 PERFORMED, AND ENFORCED IN ACCORDANCE WITH, AND GOVERNED BY, THE
LAWS OF THE STATE OF OHIO (WITHOUT GIVING EFFECT TO THE PRINCIPLES OF
CONFLICTS OF LAWS THEREOF), EXCEPT TO THE EXTENT THAT THE LAWS OF
SUCH STATE ARE SUPERSEDED BY THE BANKRUPTCY CODE OR OTHER
APPLICABLE FEDERAL LAW.

**Rest of the page left intentionally blank**

-18-

In WITNESS HEREOF, THE PARTIES HAVE SIGNED THIS AGREEMENT ON THIS
_____ DAY OF MARCH, 2021.

GENEVA VILLAGE RETIREMENT
COMMUNITY, LTD.


By: /s/ _____

Name: _____

Title: _____




ANDOVER VILLAGE RETIREMENT
COMMUNITY, LTD.


By: /s/ _____

Name: _____
Title: _____

-19-

**EXHIBIT A**

**REVOLVING PROMISSORY NOTE**

Dated as of March __, 2021

Principal Amount:     $250,000                                                    Akron, Ohio

FOR VALUE RECEIVED, Geneva Village Retirement Community, LTD (the "**Maker**"), promises to pay to the order of Andover Village Retirement Community, LTD (the "**Lender**"), on or before March 30, 2021 (the "**Maturity Date**") the principal sum of up to Teo Hundred Fifty Hundred Thousand Dollars ($250,000) (the **Maximum Loan Amount**") in lawful money of the United States of America, on the terms and conditions described below. All payments on this Promissory Note (the "**Note**") shall be made by check or wire transfer of immediately available funds or as otherwise determined by the Lender to such account as the Lender may from time to time designate by written notice in accordance with the provisions of this Note.

1.     **Principal**. Lender promises to loan to the Maker moneys not in excess of the Maximum Loan Amount, plus interest and costs as set forth in this Note. The obligations of the Make under this Note (the "**Note Obligations**") are immediately due and payable by the Maker without presentment, demand, protest or other notice of any kind; underline provided, however, that until paid in full, the Note Obligations shall be payable as follows:

2.     **Interest**. Interest shall accrue on the unpaid principal balance of this Note at the rate of Five Percent (5%) per annum commencing on the date of each draw. Maker agrees to pay to the Lender all interest then accrued under this Not then on the Maturity Date.

3.     **Reserved.**

4.     **Waivers**. The Maker waives presentment for payment, demand, notice of dishonor, protest, and notice of protest with regard to the Note, all errors, defects and imperfections in any proceedings instituted by Lender under the terms of this Note, and all benefits that might accrue to Maker by virtue of any present or future laws exempting any property, real or personal, or any part of the proceeds arising from any sale of any such property, from attachment, levy or sale under execution, or providing for any stay of execution, exemption from civil process, or extension of time for payment; and Maker agrees that any real estate that may be levied upon pursuant to a judgment obtained by virtue hereof or any writ of execution issued hereon, may be sold upon any such writ in whole or in part in any order desired by Lender.

5.     **Unconditional Liability**. The Maker hereby waives all notices in connection with the delivery, acceptance, performance, default, or enforcement of the payment of this Note, and agree that its liability shall be unconditional, without regard to the liability of any other party, and shall not be affected in any manner by any indulgence, extension of time, renewal, waiver or modification granted or consented to by Lender, and consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions of this Note.

-20-

6. **Notices**. All notices, statements or other documents which are required or contemplated by this Note shall be made in writing and delivered: (i) personally or sent by first class registered or certified mail, overnight courier service or facsimile or electronic transmission to the address designated in writing, (ii) by facsimile to the number most recently provided to such party or such other address or fax number as may be designated in writing by such party or (iii) by electronic mail, to the electronic mail address most recently provided to such party or such other electronic mail address as may be designated in writing by such party. Any notice or other communication so transmitted shall be deemed to have been given on the day of delivery, if delivered personally, on the business day following receipt of written confirmation, if sent by facsimile or electronic transmission, one (1) business day after delivery to an overnight courier service or five (5) days after mailing if sent by mail.

7. **Construction**. THIS NOTE SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF OHIO, WITHOUT REGARD TO CONFLICT OF LAW PROVISIONS THEREOF.

8. **Severability**. Any provision contained in this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. If any provision (or any part of any provision) contained in this Note shall for any reason be held or deemed to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note, and this Note shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein, and the remaining provisions of this Note shall remain in full force and effect

9. **Amendment; Waiver**. Any amendment hereto or waiver of any provision hereof may be made with, and only with, the written consent of the Maker and the Lender.

10. **Assignment**. No assignment or transfer of this Note or any rights or obligations hereunder may be made by the Maker (by operation of law or otherwise) without the prior written consent of the Lender and any attempted assignment without the required consent shall be void. This Note is freely assignable by the Lender.

11. **Remedies**. All rights, remedies, or powers conferred upon Lender shall, to the extent not prohibited by law, be deemed cumulative and not exclusive of any other thereof, or any other rights, remedies or powers available to Lender. No delay or omission of Lender to exercise any right, remedy, or power shall impair any such right, remedy or power or shall be construed to be a waiver of a default or an acquiescence therein. Any right, remedy or power conferred upon Lender hereunder may be exercised from time to time, independently or concurrently, and as often as it shall deem expedient. No waiver of any default by Lender shall extend to or shall affect any subsequent default. No single or partial exercise of any right, remedy or power by Lender shall preclude further exercise thereof by Lender. Acceptance by Lender of partial payments following

-21-

acceleration of the indebtedness evidenced hereby shall not constitute a waiver by Lender of the acceleration of such indebtedness.

All parties to this Note, including endorsers, jointly and severally, hereby authorize irrevocably any attorney-at-law to appear in an action on this Note at any time after the same becomes due, whether by acceleration or otherwise, in any court of record in or of the State of Ohio, or of elsewhere, and to waive the issuing and service of process against any or all of said parties, and to confess judgment in favor of the Lender against any or all of the said parties for the amount that may be due, and to release all errors and rights to appeal from the judgment rendered. After the judgment is entered against one or more of said parties, the powers herein conferred may be exercised as to one or more of the others.

```
****************************************************************************************
*  WARNING:  BY SIGNING THIS PAPER, YOU GIVE UP YOUR RIGHT TO      *
*  NOTICE AND COURT TRIAL.  IF YOU DO NOT PAY ON TIME, A COURT     *
*  JUDGMENT MAY BE TAKEN AGAINST YOU WITHOUT YOUR PRIOR            *
*  KNOWLEDGE AND THE POWERS OF A COURT CAN BE USED TO              *
*  COLLECT FROM YOU REGARDLESS OF ANY CLAIMS YOU MAY HAVE          *
*  AGAINST THE CREDITOR WHETHER FOR RETURNED GOODS,                *
*  FAULTY GOODS, FAILURE ON HIS PART TO COMPLY WITH THE            *
*  AGREEMENT, OR ANY OTHER CAUSE.                                  *
****************************************************************************************
```

GENEVA VILLAGE RETIREMENT
COMMUNITY, LTD.


By: _____

Name:  Michael Francus
Title:   President of Non-member Manager

-22-

**Geneva Village Retirement Community**
**Projected Cash Flow**
**For the 1 Month Ending April, 30, 2021**

| | Week 4/4/2021 | Week 4/11/2021 | Week 4/18/2021 | Week 4/25/2021 |
|---|---|---|---|---|
| Beginning Cash | $ - | $ (161,103.15) | $ (139,605.48) | $ (228,432.84) |
| **Cash Receipts:** | | | | |
| Collection of AR | 21,481.87 | 21,481.87 | 21,481.87 | 21,481.87 |
| Other | 13,124.96 | 13,124.96 | 13,124.96 | 13,124.96 |
| **Total Cash Receipts** | 34,606.83 | 34,606.83 | 34,606.83 | 34,606.83 |
| **Cash Disbursements:** | | | | |
| General Expenses: | | | | |
| Franchise Fees | - | - | - | 96,048.00 |
| Rent | 53,050.00 | - | - | - |
| Salaries & PTO | 107,887.25 | - | 107,887.25 | - |
| Payroll Taxes | 7,437.57 | - | 7,437.78 | - |
| Insurance Premiums | 9,226.00 | - | - | - |
| Office Supplies | 790.13 | 790.13 | 790.13 | 790.13 |
| Utilities | 4,319.03 | 4,319.03 | 4,319.03 | 4,319.03 |
| **Total General Expenses** | 182,709.98 | 5,109.16 | 120,434.19 | 101,157.16 |
| Chapter 11 Expenses: | | | | |
| Legal | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 |
| Accounting | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 |
| Committee | - | 5,000.00 | - | 5,000.00 |
| U.S. Trustee | 10,000.00 | - | - | - |
| **Total Chapter 11 Expenses** | 13,000.00 | 8,000.00 | 3,000.00 | 8,000.00 |
| **Total Cash Disbursements** | 195,709.98 | 13,109.16 | 123,434.19 | 109,157.16 |
| Weekly Cash Flow | (161,103.15) | 21,497.67 | (88,827.36) | (74,550.33) |
| Ending Cash | **$ (161,103.15)** | **$ (139,605.48)** | **$ (228,432.84)** | **$ (302,983.17)** |

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION, AKRON**

```
---------------------------------------------------------x
In re:                                    :   Case No. 21-50498
                                          :
GENEVA VILLAGE                            :   Chapter 11
RETIREMENT COMMUNITY, LTD                 :
                                          :
            Debtor and                    :   Judge Alan Koschik
            Debtor-in-Possession.         :
                                          :
(Employer Tax I.D. No. 01-0825952)        :
---------------------------------------------------------x
In re:                                    :   Case No. 21-50499
                                          :
GENEVA VILLAGE                            :   Chapter 11
RETIREMENT COMMUNITY, LLC                 :
                                          :   Judge Alan Koschik
            Debtor and                    :
            Debtor-in-Possession.         :
                                          :
(Employer Tax I.D. No. 11-3783756)        :
---------------------------------------------------------x
```

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN**
**POST PETITION FINANCING PURSUANT TO SECTIONS 364(c)(1) OF THE**
**BANKRUPTCY CODE AND SCHEDULING FINAL HEARING**

Upon the motion (the "<u>Motion</u>")[1] of the Debtors and Debtors in Possession (the "Debtors"), seeking entry of an order (this "<u>Order</u>") authorizing the Debtors to obtain post- petition financing under Section 364(c)(1) of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and the Local Rules of this United States Bankruptcy Court for the Northern District of Ohio (the "<u>Local Rules</u>")on an interim and final basis scheduling a final hearing thereon [Docket No. _____] in the above-captioned cases (the "<u>Bankruptcy Cases</u>"), and this Court having reviewed the Motion and the attached Super-Priority Post Petition Credit Agreement (the "<u>Agreement</u>") attached to the Motion as Exhibit A, this Court conducted a hearing to consider the relief requested in the Motion on an interim basis on Wednesday March 31, 2021 at 2:00 (the "<u>Interim Hearing</u>").

Upon the pleadings filed and the record made by the Debtors at the Interim Hearing, the Court finds as follows:

A.      On the Petition Date, each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors have retained possession of their property and continue to operate their businesses as debtors-in –possession under sections 1107 and 1108 of the Bankruptcy Code.

B.      The Court has jurisdiction over the Chapter 11 Cases and this proceeding pursuant to 28 U.S.C. §1334.  Determination of this matter constitutes a core proceeding pursuant to 11 U.S.C. 157(b)(2).   Venue over this Motion is proper under 28 U.S.C. §1409(a).

C.      The Debtors are unable to obtain unsecured credit allowable under §503(b) of the Bankruptcy Code sufficient to finance the operations of their businesses.  Except as is provided

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

below, the Debtors are unable to obtain credit under §364(b) of the Bankruptcy Code on terms more favorable than those offered by the DIP Lender. The Debtors have an immediate need for financing under the Agreement.

D.      The Agreement is being extended in "good faith" as that term is used in §364(e) of the Bankruptcy Code.

E.      The conditions of the Agreement are fair and reasonable and best available to the Debtors under the circumstances, reflect the Debtors use of prudent business judgment and are supported by reasonably equivalent value and consideration.

F.      Under the circumstances of the Chapter 11 Cases, the Agreement to permit multi-draw loans pursuant to the Agreement and the entry of this Order is in the best interest of the Debtors' bankruptcy estates and the creditors.

G.      The notice provided by the Debtors of the Motion, the Interim Hearing and the entry of this Order satisfies the requirements of Rule 2002, 4001(b) and 9014 of the Federal Rules and sections 102 and 363 of the Bankruptcy Code and applicable Local Rules and is sufficient under the circumstances.

**NOW THEREFORE, BASED UPON ALL OF THE FOREGOING, THE COURT HEREBY ORDERS THAT:**[2]

1.      The Motion shall be, and hereby is granted on an interim basis.

2.      To the extent not specifically addressed in this Order, all written and oral objections to the Motion are overruled.

---

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such.

-3-

3.    The Initial Approved Budget attached to the Agreement as Exhibit B is approved. During the term of the Agreement with respect to the items in the Approved Budget related to receipts in the forecast, the Debtors shall be permitted to make disbursements, including those which constitute a Permitted Variance under the Agreement without the prior written consent of the DIP Lender.

4.    The Debtors will execute and deliver the Agreement to the DIP Lender and are authorized to execute additional documents that the DIP Lender requests to implement the transactions contemplated by the Agreement and are authorized to perform under the Agreement and comply with the terms of this Order.  The Agreement is a valid and binding obligation of the Debtors enforceable with the terms of the Agreement.  However, to the extent that there is any conflict between the Agreement and this Order, this Order shall control.

5.    Any funds advanced by the DIP Lender under the Agreement are hereby granted super-priority administrative expenses status and section 364(c)(1) of the Bankruptcy Code. With priority over costs and expenses of the administration of these Chapter 11 Cases subject to the Carve-Out as is defined in the Agreement.

6.    The Debtors shall not incur or seek to incur any additional debt which is secured by a lien or which is equal or superior to the loans made under the Agreement or which is given a super-priority administrative expense status under Section 364(c)(1) of the Bankruptcy Code unless the DIP Lender has consented to such order.

7.    The provisions of this Interim Order shall inure to the benefit of the Debtor, the DIP Lender and shall be binding upon the Debtor, the DIP Lender and their respective successors and assigns including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtor or with respect to property of the estates of the Debtor, whether under chapter 11 of the

Bankruptcy Code or any subsequent chapter 7 case, and shall also be binding upon the United States Trustee, all creditors of the Debtor and other parties in interest.

8.      If any or all of the provisions of this Interim Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor to the DIP Lender prior to the effective date of such modification, vacation or stay (including, without limitation, the Post-Petition Indebtedness). Notwithstanding any such modification, vacation or stay, any indebtedness, obligations or liabilities incurred by the Debtor to the DIP Lender prior to the effective date of such modification, vacation or stay (including, without limitation, the post-petition indebtedness), shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein with respect to all such indebtedness, obligations or liabilities.  The obligations, indebtedness or liability of the Debtor to the DIP Lender under this Interim Order (including, without limitation, the post-petition indebtedness) shall not be discharged by the entry of an order confirming a plan of reorganization(s) in the Debtor's chapter 11 case and, pursuant to section 1141(d)(4) or section 1191 of the Bankruptcy Code, unless and until all indebtedness is paid in full in cash prior to or concurrently with the entry of such order.

9.      Any obligations or duties of the Debtor set forth in this Interim Order shall be binding upon and enforceable against any agent retained by the Debtor to perform such obligations or duties; provided, however, that neither the retention by the Debtor of an agent for the purpose of performing any such obligations or duties nor the failure of any such agent to punctually and faithfully perform any such obligations or duties shall relieve or discharge the Debtor from the punctual and faithful performance thereof.

10.     Except as otherwise provided herein, this Order shall be binding on all parties in interest in these Chapter 11 Cases and their respective successors and assigns, including a trustee appointed under Chapter 11 of the Bankruptcy Code or under any other chapter of the Bankruptcy Code to which these Bankruptcy Cases may be converted.

11.     The Court will retain jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.

12.     The hearing to consider entry of a Final Order on the Motion is scheduled for _____, 2021 at _____, _.m. in the United States Bankruptcy Court for the Northern District of Ohio.  If no objections to this Motion are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate final order may be entered by the Court. The following parties shall immediately, and in no event later than three (3) days after the entry of this Interim Order, be mailed copies of this Interim Order: (a) the Office of the United States Trustee, (b) the DIP Lender, (c) the twenty (20) largest unsecured creditors of the Debtor, and (d) all parties in interest that have filed requests for notice in this chapter 11 case.

13.     In the event this Court modifies any of the provisions of this Interim Order following such further hearing, such modifications shall not affect the rights and priorities of the DIP Lender pursuant to this Interim Order with respect to the administrative expense claims, and any portion of the post-petition indebtedness which arises, or is incurred or is advanced prior to such modifications (or otherwise arising prior to such modifications), and this Interim Order shall remain in full force and effect except as specifically amended or modified at such final hearing.

# # #

Prepared By:

Anthony J. DeGirolamo (0059265)
3930 Fulton Dr,. N.W., Ste. 100B
Canton, Ohio 44718
Telephone: 330-5305-9700
Facsimile: 330-305-9713
Email: tony@ajdlaw7-11.com

PROPOSED COUNSEL FOR THE DEBTORS
AND DEBTORS IN POSSESSION